Filed 1/23/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

<table>
<tr><td>WELCO ELECTRONICS, INC.,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>NICHOLAS J. MORA,<br><br>Defendant and Appellant.</td><td>B240626<br><br>(Los Angeles County<br>Super. Ct. No. EC052556)</td></tr>
</table>

APPEAL from a judgment of the Superior Court of the County of Los Angeles, David S. Milton, Judge. Affirmed.

Law Offices of Barry K. Rothman, Barry K. Rothman, and Gordon J. Zuiderweg for Defendant and Appellant.

Law Offices of Michael C. Murphy, Michael C. Murphy for Plaintiff and Respondent.

---

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of **DISCUSSION, parts A, 3, c, and B-D**.

## INTRODUCTION

Defendant Nicholas J. Mora appeals from a judgment in favor of plaintiff Welco Electronics, Inc., and against defendant, on plaintiff's claim for conversion, and against defendant and in favor of plaintiff on defendant's cross-complaint. Defendant contends the trial court erred in denying his motion for nonsuit based on the ground of insufficient evidence to support the plaintiff's cause of action for conversion.

In the published portion of this opinion, we determine that defendant's use of plaintiff's credit card on defendant's credit card terminal to transfer improperly specific sums of money to defendant's bank account was a conversion as pleaded by plaintiff. We affirm.

## FACTUAL BACKGROUND

In 1996 plaintiff employed Lidia Gimenes as a certified bookkeeper. Between 1996 and February 2010, she was not plaintiff's employee, but she made social visits at plaintiff's place of business "all the time," visiting Darrel Derouis, plaintiff's then-president, and other employees of plaintiff.

In February 2010, Derouis hired Gimenes to work for plaintiff because he wanted her assistance in "find[ing] where his money went." A few weeks before Derouis hired Gimenes, plaintiff no longer employed defendant Natalie Anderson,[1] plaintiff's accountant, because she "took off with no notice."

Gimenes conducted an investigation and noticed that there was a discrepancy between the entries on plaintiff's credit card statements and the amount of expenses. She examined plaintiff's credit card statements contained in plaintiff's files located in Anderson's office and determined that the entries on those statements did not match the total sum listed on the statements, thus suggesting that entries had somehow been deleted.

---

[1] Anderson is not a party to this appeal; her default was entered prior to trial.

Gimenes reviewed plaintiff's credit card statements she obtained from the credit card company and determined that they contained numerous charges to "AQM," a fictitious name used by defendant for a company he had established. Plaintiff's credit card statements located in Anderson's office did not contain charges to AQM. Gimenes also found plaintiff's accounting "chart" for AQM, but, unlike the charts for all of plaintiff's other vendors, no transactions were entered on it.

Based upon her review of the records, Gimenes determined that all of the AQM charges made on plaintiff's credit card account from 2009 to 2010, totaled $372,039.01, the principal amount that plaintiff sought in this case against defendant. She said that based on her investigation, she determined that plaintiff made the payments for the credit card statements reflecting entries for AQM.

Gimenes said she discussed this matter with Derouis, and Derouis decided to hire counsel and proceed with a lawsuit against defendant. In December 2010, Derouis died and Gimenes became plaintiff's president.

Plaintiff retained William Torres, a certified public accountant practicing forensic accounting, to conduct an investigation of plaintiff's accounting system because plaintiff was "concerned [that] there were transactions . . . that were not properly recorded or improprieties." Torres was to "come in and determine and trace any potential improprieties." Upon conducting his investigation, Torres concluded that a vendor file for AQM was set up, but it bore the address of another client and did not contain further details or transactions with respect to AQM. Torres did not find any invoices for AQM in plaintiff's records and determined that the unrecorded AQM transactions caused an imbalance to plaintiff's balance in the sum of $280,000. Torres found that there "clearly" appeared to be "a concealment" by not reporting properly the so-called AQM transactions, and there was "some sort of manipulation done to not include these transactions within the system."

Defendant provided an explanation for the accounting discrepancies. In 2006, defendant started a business called Nicholas Mora Property Management, a real property management company, and he operated that business from plaintiff's place of business.

From 2006 to 2010 defendant also performed work for plaintiff as a quality assurance manager,[2] and other computer services for plaintiff. According to defendant, he was to be compensated for his prior services when plaintiff's quality assurance computer system on which he worked was "certified" with a score of 100 percent.

Defendant said that in June 2008, the quality assurance computer system was certified with a score of 99 percent, and Derouis agreed to compensate defendant for his prior services. According to defendant, Derouis was concerned about a garnishment of defendant's wages if plaintiff paid defendant by check; therefore, Anderson, plaintiff's accountant at the time, whose responsibilities included payment of accounts payable, suggested, and Derouis "ultimately" agreed, that defendant be paid like a vendor using plaintiff's credit card account. Defendant said he and Derouis agreed that defendant would be paid $100,000 for defendant's work the prior year. Anderson set up in her office a "swiping machine" credit card terminal. Defendant opened a bank account in his name and the name of Nicholas Mora Property Management, which did business under the name of AQM Supplies. Defendant, as owner of Nicholas Mora Property Management, dba AQM Supplies, leased a swiping machine credit card terminal.

Defendant said that from 2008 to January 2010, he submitted to plaintiff about 50 or 60 invoices for the work he performed, and, although he "was not the one who processed" the charges to plaintiff's credit card account, he collected money on the credit card transactions. That money was paid through defendant's credit card terminal and electronically deposited into his bank account. From 2008 to 2009, while Anderson was working full-time for plaintiff, defendant paid Anderson about $100,000.

Defendant stated that in 2010, he and Derouis had an argument; Derouis was angry, believing that defendant had "ripped him off" by over $300,000. Derouis asked defendant to leave the premises, would not allow defendant to return to gather his possessions, and said that everything in defendant's office belonged to plaintiff.

---

[2]    Defendant testified that as a quality assurance manager, he dealt with a computer system concerning the manufacture of parts.

## PROCEDURAL BACKGROUND

In its complaint against defendant and Anderson, plaintiff asserted one cause of action—conversion of money. Plaintiff alleged that from January 1, 2008, to the time the complaint was filed on March 22, 2010, defendant and Anderson took from plaintiff, without plaintiff's knowledge or consent, $376,142.70 in cash belonging to plaintiff, and converted it for their own use. Plaintiff sought judgment against defendant and Anderson for $376,142.70 as the value of the money he alleged was converted, as well as for interest, expenses, punitive damages, and costs. Because Anderson failed to file an answer to the complaint, her default was entered.

Defendant answered, and in a cross-complaint alleged that he and plaintiff entered into a contract pursuant to which plaintiff agreed to use defendant's services and share building space, and plaintiff breached that contract "by maliciously remov[ing] [defendant] from his place of business without compensation for over thirty (30) days and was informed by [plaintiff] that any and all of [defendant's] business records and/or materials were now the property of [plaintiff]." Defendant alleged that plaintiff removed him from his place of business "with the intent of acquiring [defendant's] computer software/hardware, quality management material, personal business records, and sensitive clientele information for [plaintiff's] personal and business gain." Plaintiff allegedly refused defendant's requests to return the items to him.

During a bench trial, defendant made a motion for nonsuit on the grounds that plaintiff failed to submit sufficient evidence to establish a cause of action for conversion. The trial court denied the motion. Following the bench trial, judgment was entered in favor of plaintiff and against defendant in the amount of $446,447.81, and against defendant and in favor of plaintiff on defendant's cross-complaint. The parties did not request a statement of decision. Defendant timely appealed.

5

## DISCUSSION

### A.     Motion for Nonsuit

#### 1.     Standard of Review

"A motion for nonsuit allows a defendant to test the sufficiency of the plaintiff's evidence before presenting his or her case.  Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances." (*Carson v. Facilities Development Co*. (1984) 36 Cal.3d 830, 838.)  "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor.  [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)  "'In reviewing the denial of a motion for nonsuit, appellate courts evaluate the evidence in the light most favorable to the plaintiff.  Reversal is [proper only] when no substantial evidence exists tending to prove each element of the plaintiff's case.'  (*Wright v. Beverly Fabrics, Inc*. (2002) 95 Cal.App.4th 346, 351 [115 Cal.Rptr.2d 503].)" (*Laico v. Chevron U.S.A., Inc*. (2004) 123 Cal.App.4th 649, 659.)  Defendant sought a nonsuit based on the theory that plaintiff's evidence did not support the pleaded cause of action for conversion.

#### 2.     General Principles

"'Conversion is the wrongful exercise of dominion over the property of another.  The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. . . .  [Citation.]'" (*Los Angeles Federal Credit Union v. Madatyan* (2012) 209 Cal.App.4th 1383, 1387; see CACI 2100; *Gruber v. Pacific States Sav. & Loan Co*. (1939) 13 Cal.2d 144, 148 [conversion is the wrongful exercise of dominion "over another's personal property in denial of or inconsistent with his rights therein"].)  "'Conversion is a strict liability tort.  The foundation of the action

6

rests neither in the knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious. Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial. [Citations.]' [Citation.] The basis of a conversion action '"rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are the gist of the action." [Citations.]' [Citation.]" (*Los Angeles Federal Credit Union v. Madatyan, supra,* 209 Cal.App.4th at p. 1387; see *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 395.) The unauthorized transfer of property constitutes a conversion. (See 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 711(2), p. 1035 (Witkin).) Money may be the subject of conversion if the claim involves a specific, identifiable sum; it is not necessary that each coin or bill be earmarked. (*Haigler v. Donnelly* (1941) 18 Cal.2d 674, 681.)

### 3.    *Analysis*

Defendant contends that the transactions here—the use of a credit card to obtain money wrongfully from plaintiff—did not constitute the tort of conversion.

#### a)    Credit Card Transaction as a Wrongful Taking of Property

The authorities have recognized the evolution of the common law tort of conversion. The California Supreme Court in *Payne v. Elliot* (1880) 54 Cal. 339 observed that at common law, trover was the remedy for conversion, which was limited to tangible personal property, "capable of being identified and taken into actual possession." (*Id.* at p. 340.) The court said, "but the fiction on which the action of trover was founded, namely, that a defendant had found the property of another, which was lost, has become, in the progress of law, an unmeaning thing, which has been by most courts discarded; so that the action no longer exists as it did at common law, but has been developed into a remedy for the conversion of every species of personal property." (*Id.*

7

at p. 341.)  The court concluded that the defendant's conversion of shares of stock, an intangible property interest (*Ashton v. Heydenfeldt* (1899) 124 Cal. 14, 16), without converting the share certificates, constituted an actionable conversion.  (*Payne v. Elliot*, *supra*, 54 Cal. at pp. 341-342.)

Generally, conversion has been held to apply to the taking of intangible property rights when "*represented by documents* such as bonds, notes, bills of exchange, stock certificates, and warehouse receipts."  (5 Witkin, *supra,* Torts, § 702, p. 1026.)  As one authority has written, "courts have permitted a recovery for conversion of assets reflected in such documents as accounts showing amounts owed, life insurance policies, and other evidentiary documents.  These cases are far removed from the paradigm case of physical conversion; they are essentially financial or economic tort cases, not physical interference cases."  (3 Dobbs, The Law of Torts (2d ed. 2011) § 710, p. 804; see also Prosser, Handbook of the Law of Torts (2d ed. 1955) 69-70 ["It is now held that there may be an action for conversion, not only of the intangible rights represented by special instruments which give control, such as a check, a bill of lading, a bank book, an insurance policy, or a stock certificate, but also of such rights alone, as in the case of the corporate stock apart from the certificate.  There is perhaps no essential reason why there might not be a conversion of a debt, the good will of a business, or even an idea, or 'any species of personal property which is the subject of private ownership;' but thus far there has been no particular need for any extension of the remedy beyond commercial securities"]; but see Prosser and Keaton on Torts (5th ed. 1984) § 15, p. 92.)

As stated in the Restatement of Torts Second in comment f. section 242, "The process of extension [of the law of conversion] has not, however, necessarily terminated; and nothing that is said in this Section is intended to indicate that in a proper case liability for intentional interference with some other kind of intangible rights may not be found."  There is no reason why we should be "encumbered with the incrustations of ancient lore associated with the tort of conversion."  (Harper, James and Gray on Torts (3d ed. rev. 2006) § 2.13, p. 212 (Harper).)

8

In California, the tort of conversion has expanded well beyond its original boundaries. In holding that a misappropriation of a net operating loss without compensation constitutes conversion, the court in *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 124-125 (footnotes omitted) (*Fremont*) said, "We recognize that the common law of conversion, which developed initially as a remedy for the dispossession or other loss of chattel [citation], may be inappropriate for some modern intangible personal property, the unauthorized use of which can take many forms. In some circumstances, newer economic torts have developed that may better take into account the nature and uses of intangible property, the interests at stake, and the appropriate measure of damages. On the other hand, if the law of conversion can be adapted to particular types of intangible property and will not displace other, more suitable law, it may be appropriate to do so. (*Payne v. Elliot*, *supra*, 54 Cal. at pp. 340-342.) The appropriate scope of a conversion action as applied to intangible personal property has been the subject of scholarly and informative discussion. (See, e.g., Harper [], *supra*, § 2.13, pp. 204-214; Comment, *Analyzing the Urge to Merge: Conversion of Intangible Property and the Merger Doctrine in the Wake of Kremen v. Cohen* (2005) 42 Hous. L.Rev. 489; 1 Dobbs, Law of Torts (2001) Direct and Intentional Interference with Property, § 63, pp. 132-135; Comment, *The Conversion of Intangible Property: Bursting the Ancient Trover Bottle with New Wine* (1991) 1991 BYU L.Rev. 1681; *Prosser and Keeton, Torts, supra, Intentional Interference with Property*, § 15, pp. 90-92; see also *Kremen v. Cohen* (9th Cir. 2003) 337 F.3d 1024, 1029-1036[3].)" The court in *Fremont* held that the unauthorized taking of an intangible property interest not merged with or

---

**3**    The Ninth Circuit in *Kremen v. Cohen* (9th Cir. 2003) 325 F.3d 1035 considered whether the appropriation of an Internet domain name constituted a conversion and requested a decision from the California Supreme Court on that issue. (*Fremont, supra,* 148 Cal.App.4th at p. 125, fn. 10.) One judge in that case said, "California law, even narrowly construed, recognizes conversion of property that shares all relevant features of domain names." (*Kremen v. Cohen, supra,* 325 F.3d at p. 1050 [dissent to certification].) The California Supreme Court denied the request to decide the issue, and thereafter the Ninth Circuit held that under California law an Internet domain name could be the subject of a conversion. (*Kremen v. Cohen*, *supra*, 337 F.3d at pp. 1030, 1036.)

reflected in tangible property can be an actionable conversion. (*Fremont, supra,* 148 Cal.App.4th at pp. 119-125; see *Kremen v. Cohen*, *supra*, 337 F.3d at p. 1033 [California courts "routinely apply the tort [of conversion] to intangibles without inquiring whether they are merged in a document"].) In determining whether property that was taken is subject to a conversion claim, courts have recognized that "[p]roperty is a broad concept that includes 'every intangible benefit and prerogative susceptible of possession or disposition.' [Citation.]" (*Id.* at p. 1030; see *CTC Real Estate Services v. Lepe* (2006) 140 Cal.App.4th 856, 860 [one's personal identifying information "is a valuable asset, the misuse of which can have serious consequences to that person" and can be the object of theft.]

In *A&M Records, Inc. v. Heilman* (1977) 75 Cal.App.3d 554, 570, the court said that the unauthorized recording and sale of recorded musical performances constituted a misappropriation of intangible property, which was a conversion. According to another court, the court in *Heilman* "implied conversion was a species of unfair competition." (*Lone Ranger Television, Inc. v. Program Radio Corp.* (9th Cir. 1984) 740 F.2d 718, 725.) Thus, the tort of conversion has been adapted to new property rights and modern means of commercial transactions.

Defendant wrongfully caused a charge to plaintiff's credit card account by having a specific sum of money paid through defendant's credit card terminal into defendant's bank account. Plaintiff had a property right in its credit card account because plaintiff's interest was specific, control over its credit card account, and an exclusive claim to the balance. (See *Kremen v. Cohen*, *supra*, 337 F.3d at p. 1030.) Defendant obtained the money from the credit card company. As a result, plaintiff became indebted to the credit card company. Thus, when defendant, or codefendant Anderson for defendant's benefit, misappropriated plaintiff's credit card and used it, part of plaintiff's credit balance with the credit card company was taken by defendant and what resulted was an "unauthorized transfer" to defendant of plaintiff's property rights—i.e., in money from the available credit line belonging to plaintiff with the credit card company. (5 Witkin, *supra,* Torts at § 711(2), p. 1035 [unauthorized transfer as conversion].) That the taking was something

10

that affected plaintiff's rights with a third party does not mean that there has not been a conversion of intangible property. As noted, there can be a conversion of intangible rights represented by special instruments such as a check bank book, insurance policy, or stock certificate (see Rest.2d Torts, § 242, comments a through e, pp. 473-475), all of which involve a taking by the defendant of the plaintiff's property rights exercised through a third party.

In *Acme Paper Co. v. Goffstein* (1954) 125 Cal.App.2d 175, the defendant was given checks drawn by the plaintiff and then signed or had a third person sign the payee's name, and took or shared the proceeds with that third person rather than delivering the checks to the payee in accordance with the defendant's representations upon being given the checks. The plaintiff filed a complaint against the defendant. Judgment was entered in favor of the plaintiff, and the defendant appealed. The court held that, "although technical words of conversion are not used, in stating the second cause of action there are assuredly facts alleging a conversion. There are allegations of fraud on the part of [the defendant] in that he obtained certain checks of [the plaintiff] and exercised dominion over them in a manner not contemplated by [the plaintiff]. By either signing or having [a third person] sign the [payee's] name . . . thereto and sharing the proceeds with [the third person], rather than delivering the checks to [the payee] in accordance with his representation to [the plaintiff], [the defendant] clearly converted the checks." (*Id*. at p. 179.) The court observed that, "The subject matter of the conversion is the checks received by [the defendant] and applied to his own use or that of [the third person]." (*Id*. at p. 181.) As here, the actual money taken came from a third party—there the bank and here the credit card company.

Credit card, debit card, or Paypal[4] information may be the subject of a conversion. In *In re Easysaver Rewards Litig., supra,* 737 F.Supp.2d 1159, the plaintiffs filed a class

---

[4] "PayPal provides an intermediary account for internet purchases. PayPal charges the seller a fee for its service. The customers fund their PayPal accounts through electronic transfers from their own financial institution (e.g., checking account, debit card, or credit card). PayPal keeps the customers' financial information confidential,

action lawsuit against defendants Provide and EMI.  The plaintiffs alleged that as a part of the "revenue generating efforts" of Provide, an operator of several internet businesses, it "'routinely and fraudulently transmit[ed] its consumers' credit card, debit card and/or Paypal information ("Private Payment Information") to its third party marketing partners.'"  (*Id*. at p. 1163.)  The plaintiffs alleged that EMI was Provide's marketing partner, and EMI "'fraudulently charge[d] the cards or accounts without permission under the guise that' Provide's customers have 'supposedly joined a savings program known as EASYSAVER Rewards, which [EMI] manages on [Provide's] behalf.'"  (*Id*. at pp. 1163-1164.)  The plaintiffs further alleged that "'the EASYSAVER Rewards program . . . [was] nothing more than a sham.'"  (*Id*. at p. 1163.)  The plaintiffs in that case alleged, inter alia, that Provide wrongfully converted their Private Payment Information.  (*Id*. at p. 1179.)  Provide filed a motion to dismiss, inter alia, the conversion claim alleged against it for failure to state a claim upon which relief could be granted.  (*Id*. at pp. 1163, 1180.)  The federal district court denied the motion as to that claim, stating, "Plaintiffs define 'Private Payment Information' as the consumers' credit card, debit card and/or PayPal account information. . . .  Provide argues that . . . the intangible financial information . . . [does not] qualify as 'property' that can be converted.  [¶]  . . . Historically, the tort [of conversion] was limited to tangible property and did not apply to intangible property (with an exception for intangible property represented by documents, such as stock certificates).  [Citation.]  Modern courts, however, have permitted conversion claims against intangible interests such as checks and customer lists.  *Acme Paper Co. v. Goffstein*, [*supra*,] 125 Cal.App.2d [at p.] 179; *Palm Springs-La Quinta Dev. Co. v. Kieberk Corp.*, 46 Cal.App.2d 234, 115 P.2d 548 (1941) (conversion of index cards with information on potential customers, including their financial standing); see *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal.App.4th 1559, 54 Cal.Rptr.2d 468 (1996) (leaving open question whether confidential codes to gain computer access could be converted because trespass to personal property claim existed); see generally *Kremen v. Cohen*, [*supra*,] 337 F.3d [at

thereby providing a measure of security for online purchases.  [Citation.]"  (*In re Easysaver Rewards Litig*. (S.D.Cal. 2010) 737 F.Supp.2d 1159, 1163, fn. 1.)

12

p.] 1030 (noting modern rejection of hard line between tangible and intangible property and holding plaintiff could state conversion claim as to internet domain name). [¶] . . . [¶] Although there is no clear authority, the Court concludes that [the] Plaintiffs may state a conversion claim based upon the misappropriation of their Private Payment Information, which was then used to make allegedly unauthorized debits from their financial accounts. Possession of the debit card or PayPal account information is similar to the intangible property interest in a check. *Acme Paper*, 125 Cal.App.2d at 179. [The p]laintiffs assert the right to control the use of their Private Payment Information, which can be used to withdraw funds from their bank accounts. See *In Re Checking Account Overdraft Litig*., 694 F.Supp.2d 1302, 1323 (S.D. Fla. 2010) (applying California law, holding that conversion action is available for wrongful debiting of funds from customer's account because it interfered with [the] plaintiffs' right to possess and use those funds)." (*Id*. at pp. 1179-1180.)

Defendant, or Anderson on defendant's behalf, had to take plaintiff's credit card or its information in order to obtain the money from the credit card company, resulting in charges showing up on the statement for which plaintiff was responsible to pay. Taking a credit card or its information in order to obtain money is not materially different in effect than conversions by taking other instruments such as checks, bonds, notes, bills of exchange, warehouse receipts, stock certificates, and information related to those instruments, to obtain someone else's money. Nor is the taking of a credit card or its number to obtain money that could otherwise be used by the owner materially differ from the taking of private payment information or other property held to be capable of being converted.

As the court in *Fremont, supra,* 148 Cal.App.4th at page 125, in another context, said, "A net operating loss is a definite amount (see 26 U.S.C. § 172(c)) that can be recorded in tax and accounting records. The significance of this, in our view, is not that the intangible right is somehow merged or reflected in a document, but that both the property and the owner's rights of possession and exclusive use are sufficiently definite and certain. The misappropriation of a net operating loss without compensation in the

13

manner alleged in the complaint, causing damage to Indemnity as alleged, is comparable to the misappropriation of tangible personal property or shares of stock for purposes relevant here. We see no sound basis in reason to allow recovery in tort for one but not the other." A net operating loss that can be used by a taxpayer is analogous to a credit card balance that can be used by the cardholder. In both instances, a party is deprived ultimately of money. By, in effect, taking from plaintiff, or without authorization transferring plaintiff's rights in, a certain identifiable sum equivalent to money, defendant has converted an intangible property right.

Cases holding that a conversion claim "fails because the simple failure to pay money owed does not constitute conversion" (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 284), or because there was an overcharge (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1467) are not applicable here, because in those cases, there was no taking of intangible property. Also inapplicable is *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472 (*Software Design*) [plaintiff sought to recover from brokerage firms money the wrongdoers deposited and withdrew from the different firms] because it simply held that "[a] bailee who receives bailed property from a thief, without notice of the true owner's claim and returns the property to the bailor according to the terms of the bailment, is not liable for conversion." (*Id.* at p. 485.)

Defendant cites *Moore v. Regents of University of California* (1990) 51 Cal.3d 120 (*Moore*) to support his contention that the appropriation and unauthorized use of a credit card and its information does not constitute conversion. In *Moore*, the plaintiff alleged that the removal of his spleen and its use in potentially lucrative medical research, without his knowledge, was a conversion. (*Id.* at pp. 126, 134-135.) In affirming the trial court's orders sustaining the defendants' demurrers to the operative complaint, the court stated, "No court . . . has ever in a reported decision imposed conversion liability for the use of human cells in medical research. While that fact does not end our inquiry, it raises a flag of caution. . . . In effect, what [the plaintiff] is asking us to do is to impose a tort duty on scientists to investigate the consensual pedigree of each human cell sample used

14

in research.  To impose such a duty, which would affect medical research of importance to all of society, implicates policy concerns far removed from the traditional, two-party ownership disputes in which the law of conversion arose." (*Id*. at p. 135, footnotes omitted.)  The court stated that it "should be hesitant to 'impose [new tort duties] when to do so would involve complex policy decisions' [citation], especially when such decisions are more appropriately the subject of legislative deliberation and resolution." (*Id*. at p. 136.)  *Moore* is not applicable here.  That case concerned the alleged conversion of human cells by their use in medical research, which involved complex policy decisions, a far cry from the misappropriation and unauthorized use of a credit card and its information, which does not involve any such complex policy decisions.

Without citing to legal authority, defendant contends that if the misappropriation of a credit card that occurred here constitutes a conversion, then any transaction involving a credit card that leads to a dispute is subject to a cause of action for conversion. Defendant gives examples of what might be conversions under this hypothesis:  persons using a credit card to purchase or pay for goods, medical bills, or lawyer bills, and disputes later arises regarding the quality of the goods, fault concerning the medical treatment, or the appropriateness of the legal bills.  This argument lacks merit.  A person's willing use of a credit card to pay for goods or services has no relationship to what occurred here.  Plaintiff did not consent to its credit card or its information being used by or on behalf of defendant.  This case does not involve "the simple failure to pay money owed[, which] does not constitute conversion" (*Kim v. Westmoore Partners, Inc.*, *supra*, 201 Cal.App.4th at p. 284), nor does it concern a simple overcharge, which also does not constitute a conversion (*McKell v. Washington Mutual, Inc.*, *supra*, 142 Cal.App.4th at p. 1467).

Although the parties have not cited any authority that expressly covers the facts here, our application of the tort of conversion in this case is consistent with existing legal

15

principles.[5]  As what was found to have occurred here was a theft, the tort of conversion was an appropriate cause of action.  Accordingly, the trial court did not err by denying defendant's motion for nonsuit.  Plaintiff stated a cause of action for and presented substantial evidence in support of, conversion.

b)      Specific Sum of Money Entrusted to Defendant

Defendant contends that the trial court erred in denying his motion for nonsuit, arguing that there was insufficient evidence that a specific sum of money was entrusted to defendant, and the taking of "various amounts of money over time" is not conversion.

As discussed *ante,* the intangible property converted was plaintiff's credit card or its number and a portion of plaintiff's credit card account, resulting in the taking from plaintiff, or unauthorized transfer of, a specific sum of money.  Even if the conversion were to be treated as a conversion of money, a conversion claim does not require that a specific lump sum of money be entrusted to defendant; the plaintiff must merely prove a specific, identifiable sum of money that was taken from it.  "California cases permitting an action for conversion of money *typically* involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others.  [Citations.]" (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, *supra*, 150 Cal.App.4th at pp. 396, italics added.)  Cases have held that the amount of money converted was readily ascertainable.  (See, e.g., *Los Angeles Federal Credit Union v. Madatyan, supra,* 209 Cal.App.4th at p. 1388 [defendants, a car repair shop owner and its manager are liable for conversion because plaintiff proved that defendants endorsed an insurance check in the amount of $39,697.35 that was given to them by another, in which

---

**5**     See Nelson, The Virtual Property Problem: What Property Rights in Virtual Resources Might Look Like, How They Might Work, and Why They Are a Bad Idea (2010) 41 McGeorge L.Rev. 281, 299-3-2 [a "thief" of virtual property may be liable for conversion]; Haddock, et al., An Ordinary Economic Rationale for Extraordinary Legal Sanctions (1990) 78 Cal. L.Rev. 1, 48 ["common theft can result in actions for both criminal larceny and civil conversion"].

proceeds plaintiff, a credit union, had an equitable interest]; *Bazzanella v. Bell* (1970) 10 Cal.App.3d 560 [the court affirmed the trial court's ruling that defendant was liable for conversion of checks totaling $12,694.72, which had been assigned to plaintiff].)

A plaintiff must specifically identify the amount of money converted, not that a specific, identifiable amount of money has been entrusted to the defendant. Here, plaintiff's agents have misappropriated a specific sum of money from plaintiff. There is no requirement that the money have been held in trust—only that it be misappropriated. The court in *McKell v. Washington Mutual, Inc.*, *supra*, 142 Cal.App.4th 1457 reversed an order of dismissal following the trial court's order sustaining a demurrer to the operative complaint, stating, inter alia, without citation that "plaintiffs did not allege that defendants were holding their payments on behalf of another, in essence in trust for the third party vendors." (*Id*. at p. 1492.) The court, however, prefaced that quoted language by stating that, "Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, *such as* where an agent accepts a sum of money to be paid to another and fails to make the payment. [Citations.]" (*Id*. at p. 1491; italics added.) That is, a defendant's acceptance of money to be paid to another is but one example of a conversion claim.

Citing *Software Design*, *supra,* 49 Cal.App.4th 472, defendant states that a claim for conversion is not stated when money is allegedly misappropriated "over time, in various sums, without any indication that it was held in trust for [plaintiff]." Defendant takes that quote from *Software Design* out of context. In that case, McDonald was hired to manage the investments of the appellants, Software Design and Application, Ltd., a foreign corporation (SDA), and SDA's sole owner. (*Id.* at p. 476.) McDonald and his sister opened brokerage accounts with banks, but instead of putting the accounts in the name of SDA, the foreign corporation, McDonald opened them in the name of a non-existent limited partnership, called "Software Design & Application, Ltd." (*Id.* at p. 476-478.) SDA's owner transferred funds into the accounts, and over the course of two years, McDonald systematically "sacked" the brokerage accounts. (*Id.* at p. 477.)

17

Although in *Software Design*, *supra,* 49 Cal.App.4th 472, the plaintiffs were not customers of the banks, the plaintiffs brought suit against them for, inter alia, conversion. In affirming the trial court's dismissal of the complaint on demurrer, the court stated that the plaintiffs "cannot state a common law count for conversion of money. Conversion is any act of dominion wrongfully exerted over the personal property of another. [Citation.] However, money cannot be the subject of a conversion action unless a specific sum capable of identification is involved. [Citation.] As to the *banks* there are no allegations *that as money in varying amounts was wired into the accounts, it was held in escrow or in some otherwise segregated fund for the benefit of [plaintiff] SDA.* Rather, it came into the partnership accounts over time, in various sums, without any indication that it was held in trust for [plaintiff] SDA." (*Id*. at p. 485; italics added.) That is, the defendant banks were not liable to the plaintiffs because the accounts into which the defendants transferred their money were in the name of a non-existent partnership, not plaintiff SDA. The court noted that the wire transfers in that case were not "instruments" for purposes of Commercial Code section 3420, and therefore the plaintiffs could not maintain an action for conversion based on that statute. (*Ibid.*) Here, plaintiff was, in effect, the owner of the credit card that was misappropriated, as well as of the account that defendant improperly charged.

Plaintiff proved a specific, identifiable sum of money that defendant had taken from it. Gimenes testified that the total sum of the improper charges made on plaintiff's credit card for defendant's benefit was $372,039.01—the total principal amount plaintiff sought against defendant. The trial court properly awarded this principal amount to plaintiff and against defendant, together with prejudgment interest in the sum of $74,407.80.

### c) Plaintiff's Lack of Consent

Defendant contends that the trial court erred in denying his motion for nonsuit contending that plaintiff's failed to establish a cause of action for conversion of money

18

because there is not substantial evidence that plaintiff did not consent to the taking of the money. We disagree.

There is evidence that defendant and Derouis had an argument because Derouis was angry, believing that defendant had "ripped him off" by over $300,000. Derouis asked defendant to leave the premises, would not allow defendant to return to gather his possessions, and said that everything in defendant's office belonged to plaintiff. Gimenes testified that Derouis hired her to work for plaintiff because Derouis was concerned and wanted Gimenes assistance in "find[ing] where his money went." Gimenes testified that she conducted an investigation, determined that defendant had taken $372,039.01 from plaintiff, and when she discussed the matter with Derouis, Derouis decided to hire counsel and proceed with a lawsuit against defendant. There is substantial evidence that plaintiff did not consent to the taking of the money. (See *McIntyre v. Sonoma Valley Unified School Dist.* (2012) 206 Cal.App.4th 170, 179 [substantial evidence standard of review is a determination as to whether there is any substantial evidence, contradicted or uncontradicted, to support the findings below. We view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor].)

## B. Admissible Evidence

Defendant contends that the trial court erred in admitting certain exhibits because they were not authenticated, in allowing Gimenes's testimony because she lacked personal knowledge, and without that evidence there is not substantial evidence in support of the judgment. The trial court did not err in admitting the evidence.

### 1. Standard of Review

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805; *People v. Harris* (2005) 37 Cal.4th 310, 335; *People v. Alvarez* (1996) 14 Cal.4th 155, 201.) "'"[A] trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in

19

an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.""" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329.)

A writing must be authenticated before it may be received into evidence or before secondary evidence of their contents may be received. (Evid. Code, § 1401.) Evidence Code Section 1400 provides, "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." Evidence Code Section 403, subdivision (a)(3) provides, "(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when: [¶] . . . [¶] The preliminary fact is the authenticity of a writing."

Evidence Code section 702, subdivision (a), provides, "[T]he testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter."

### 2. *Background Facts*

Plaintiff moved to introduce into evidence various exhibits to establish that defendant converted plaintiff's money by making unauthorized charges to plaintiff's credit card account and those charges were paid by plaintiff. Specifically, plaintiff moved to introduce into evidence plaintiff's credit card statements; checks from plaintiff's checking account; and plaintiff's checking account statements. Plaintiff offered into evidence an exhibit as circumstantial evidence that plaintiff's payment of the statement was authorized; it was otherwise offered for the limited purpose of plaintiff's "notice that [it] was in [plaintiff's] file; and when compared with the bank documents, there were no AQM charges on that." Plaintiff offered into evidence an exhibit for the limited purpose of "showing [that] the additional bank records statements that are

20

contained in [other exhibits] correspond with and can be traced to the actual full and complete copy of the bank statement."

Defendant stipulated that Gimenes found a credit card statement in plaintiff's files, and plaintiff paid the amount invoiced. Gimenes testified that she found one of the exhibits on the floor in defendant's office after he had left plaintiff's premises. Defendant testified that he was familiar with a statement exhibit because he looked through it about seven months before trial when the trial court ordered plaintiff to produce it to defendant.

Gimenes testified that plaintiff issued checks to plaintiff's credit card company, and they bore Derouis's signature or his signature stamp. She testified that she received statements from plaintiff's credit card company in response to her request. Gimenes said that she received bank statements from plaintiff's bank in response to her request.

The trial court admitted into evidence the exhibits over defendant's objections that, inter alia, they were not authenticated. The trial court admitted into evidence some exhibits without objection by defendant.

### 3. *Analysis*

Defendant contends that the trial court erred in admitting exhibits into evidence because they were not authenticated. The challenged exhibits were authenticated properly, or in some instances defendant forfeited his contention by not objecting to the introduction of exhibits into evidence.

"A writing may be authenticated by evidence that: [¶] . . . [¶] (b) The writing has been acted upon as authentic by the party against whom it is offered." (Evid. Code, § 1414, subd. (b); *City of Vista v. Sutro & Co.* (1997) 52 Cal.App.4th 401, 412-413.) "Evidence Code sections 1410 through 1421 list various methods of authentication of documents—e.g., by the testimony of a subscribing witness or a handwriting expert—but these methods are not exclusive. [Citations.] 'California courts have never considered the list set forth in Evidence Code sections 1410-1421 as precluding reliance upon other means of authentication.' [Citation.] 'Circumstantial evidence, content and location are

all valid means of authentication . . . .' [Citation.]" (*People v. Smith* (2009) 179 Cal.App.4th 986, 1001.)

Gimenes testified that she found a statement in defendant's office. It is reasonable to infer that because it was found in defendant's office, that defendant acted upon it and it was therefore authentic. (Evid. Code, § 1414, subd. (b).) In addition, the parties stipulated that Gimenes discovered a credit card statement in plaintiff's files. Circumstantial evidence—the location and content of the statement—was sufficient to authenticate it—whether it was located in defendant's office or plaintiff's files. (*People v. Smith*, *supra*, 179 Cal.App.4th at p. 1001.)

The trial court admitted into evidence certain exhibits without objection by defendant. Defendant therefore forfeited his contention that the trial court erred in admitting these exhibits into evidence. "Ordinarily, an appellate court will not consider a claim of error if an objection could have been, but was not, made in the lower court. [Citation.] The reason for this rule is that '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.' [Citations.] '[T]he forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error.' [Citation.]" (*People v. French* (2008) 43 Cal.4th 36, 46; *People v. Lord* (1994) 30 Cal.App.4th 1718, 1722 [defendant's failure to request a hearing on the necessity of a support person's presence, waived any objection to the failure to hold a hearing].)

"A writing may be authenticated by evidence that the writing was received in response to a communication sent to the person who is claimed by the proponent of the evidence to be the author of the writing." (Evid. Code, § 1420; *People v. Roland* (1969) 270 Cal.App.2d 639, 646 [a teletype from the Department of Motor Vehicles was authenticated by a witness who testified that he received it in response to his telephonic request for it].) Gimenes testified that she received statements from plaintiff's credit card company in response to her request. They, therefore, were properly authenticated.

Defendant also contends that the trial court erred in allowing Gimenes's testimony because she lacked personal knowledge. Gimenes is a certified bookkeeper and plaintiff's president and was able to compare plaintiff's accounting documents with its credit card and bank account statements and records. Allowing her testimony was not error. Moreover, defendant did not object to portions of Gimenes testimony.

In addition, defendant fails to establish what portions of Gimenes testimony to which he objected at trial and challenges on appeal. It is not our role to seek out support for a defendant's conclusory assertions, and such contentions may be rejected without consideration. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) "Where any error is relied on for a reversal it is not sufficient for appellant to point to the error and rest there." (*Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77.) "It is not our responsibility to develop an appellant's argument. [Citation.]" (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11; *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1) ["We will not develop the appellants' arguments for them"].) "The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment. It is entitled to the assistance of counsel." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 701, p. 769.) Defendant therefore failed to carry his burden of establishing that the trial court erred in allowing Gimenes's testimony because she lacked personal knowledge.

## C.    Cross-Complaint

Defendant contends that the judgment against defendant on his cross-complaint should be reversed because it too was based on inadmissible evidence. Defendant alleged in his cross-complaint that he and plaintiff entered into a contract by which plaintiff agreed to use defendant's services and share building space, and plaintiff breached that contract by improperly removing defendant from his place of business without compensation and was informed by plaintiff that any and all of defendant's business records and materials was the property of plaintiff.

Defendant however does not develop his contention that the judgment against defendant on his cross-complaint was based on inadmissible evidence, or provide citations to the record or otherwise cite to authority that would support it. The failure to cite authority or develop an argument with reference to any specific alleged deficiencies in the record constitutes a forfeiture of the issue on appeal. (*Magic Kitchen LLC v. Good Things Internat. Ltd.* (2007) 153 Cal.App.4th 1144, 1161-1162; *Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1215 ["Contentions are waived when a party fails to support them with reasoned argument and citations to authority"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"]; *People v. Stanley*, *supra*, 10 Cal.4th at p. 793 [It is not the role of a reviewing court to independently seek out support for appellant's conclusory assertions, and such contentions may be rejected without consideration]; *Alvarez v. Jacmar Pacific Pizza Corp.*, *supra*, 100 App.4th at p. 1206, fn. 11 ["It is not our responsibility to develop an appellant's argument"]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties"].) We therefore do not consider defendant's contention.

## D. Damages

Defendant contends that despite Gimenes testimony that the credit charges constituting defendant's conversion of funds reflected in a statement totaling $108,336.10, the statement actually totals $95,817.20, and it would be "unfair" to charge defendant with that error. Defendant, however, never objected during trial that there was an erroneous calculation of the claimed damages. Defendant also did not cross-examine Gimenes regarding her calculations, nor did he introduce evidence that Gimenes's calculations were incorrect. Defendant, therefore, forfeited his contention. (*People v. French*, *supra*, 43 Cal.4th at p. 46; *People v. Lord*, *supra*, 30 Cal.App.4th at p. 1722.)

24

**DISPOSITION**

The judgment is affirmed.  Plaintiff is awarded its costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**


                              MOSK, J.


I concur:



        TURNER, P. J.


25

CERTIFIED FOR PUBLICATION

Welco Electronics, Inc. v. Nicholas J. Mora, B240626

KRIEGLER, J., Concurring.

I concur in the result, but not the reasoning, of the majority opinion. The appellate record conclusively demonstrates that defendant Nicholas J. Mora misappropriated $372,039 from plaintiff Welco Electronics, Inc. The trial court characterized Mora's version of events as "absolutely nonsense," "difficult to listen to," and "absolutely ludicrous." But the ultimate conclusion articulated by the court was not that there was a conversion of the balance of a credit card account; instead, the court quite accurately described Mora's conduct as a "theft," finding that Mora "stole the money," and he conspired with codefendant Natalie Anderson "in committing theft and committed a theft in the amount of $372,039.01." I would affirm the judgment on the basis of the trial court's finding of theft.

This case was tried on the straightforward theory that Mora committed a series of thefts, in differing amounts and at various times, from Welco. Although labeled a cause of action for conversion, Welco alleged in part that Mora and Anderson "took the property described above from plaintiff's possession without its consent or knowledge . . . ." It was alleged that Welco "was, and still is, the owner, and was and is, entitled to possession of the following personal property, namely, cash in the sum of $376,142.70." In closing argument, Welco's counsel stated: "The long and short of it is *the money was converted*. He is responsible for the conversion *of the money*. He received *the money*, and it's a strict liability tort." In other words, Welco's theory had nothing to do with conversion of the balance of its credit card.

We are required to liberally construe Welco's complaint to affect substantial justice. (Code Civ. Proc., § 452.) Regardless of the label attached to a pleading, "'[a] party is entitled to any and all relief which may be appropriate under the scope of his pleadings and within the facts alleged and proved, irrespective of the theory upon which

the facts were pleaded, [or] the title of the pleading . . . .'" (*Cooper v. State Farm Mutual Automobile Ins. Co.* (2009) 177 Cal.App.4th 876, 904, quoting *Potrero Homes v. Western Orbis Co.* (1972) 28 Cal.App.3d 450, 456.) "We have the power, as a reviewing court, to disregard the 'mislabeling' of causes of action, where supported by the record. (*Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1566 . . . .)" (*Hernandez v. Lopez* (2009) 180 Cal.App.4th 932, 938 (*Hernandez*).)

My colleagues go to great lengths to conclude Mora's conduct constituted a conversion based on the theory—not alleged in the complaint or asserted on appeal until prompted by a letter from the court—that a conversion occurred because Mora took Welco's right to a balance in its credit card. I see no need to engage in that analysis. "Suffice it to say, defendants may not appropriate" Welco's property by engaging in 50-60 unauthorized credit card transactions "without having to answer legally . . . ." (*Hernandez*, *supra*, 180 Cal.App.4th at p. 940.) The record establishes that Mora stole money using Welco's credit card account, and his conduct "amounted to the embezzlement thereof." (*Vujacich v. Southern Commercial Co. (*1913) 21 Cal.App. 439, 442.) I would affirm the judgment on this basis—Welco effectively alleged and proved, and the trial court found, that Mora committed theft of $372,039.

Treating Welco's claim as one of theft of money avoids the further problem created by the majority's analysis of the requirement that conversion of money requires the identification of a sum certain. California law has recognized liability for conversion *of money* in limited circumstances: there must be a sum certain and the holder of the money must do so in trust, for the benefit or another, or for his principal's account. (*Haigler v. Donnelly* (1941) 18 Cal.2d 674, 681.) "A cause of action for conversion of money can be stated only where a defendant interferes with the plaintiff's *possessory interest* in a specific, identifiable sum, such as when a trustee or agent misappropriates the money entrusted to him." (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 284-285.)

2

It has been held that where a defendant comes into possession of "various sums" of money, "without any indication that it was held in trust" for the plaintiff, there is no cause of action for conversion.  (*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472, 485.)  The rule was stated in *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457 as prohibiting a cause of action for conversion of money where "plaintiffs did not allege that defendants were holding their payments on behalf of another, in essence in trust for the third party vendors."  (*Id*. at p. 1491.)

Mora did not receive a fixed sum of money in an agency, fiduciary, or trust relationship with Welco.  Mora took a variety of sums, over a period of time, by use of multiple larcenous transactions.  I would affirm the judgment on that basis.


KRIEGLER, J.

3