Filed 3/24/21  Seretti v. Augustine CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PHILLIP SERETTI, as Trustee, etc., | B293621 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC576221 |
| v. | |
| MICHAEL AUGUSTINE, as Trustee, etc., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Victor E. Chavez, Judge.  Affirmed.

Law Offices of Roger N. Golden and Roger N. Golden for Plaintiff and Appellant.

Gutman Law, Alan S. Gutman and John Juenger for Defendant and Respondent Michael Augustine.

Benedon & Serlin, Gerald M. Serlin and Judith E. Posner; Niebow Law and Steven N. Niebow for Defendant and Respondent Zachary Schneiderman.

———————————

1

In March 2015, plaintiff Phillip Seretti, as the current trustee of the Oflye Trust (Oflye) and on the trust's behalf, sued Zachary Schneiderman, a former trustee of Oflye, and Michael Augustine, the current trustee of the Jojazak Irrevocable Trust (Jojazak), asserting claims for breach of fiduciary duty, fraud, conversion, and unjust enrichment based on a series of purported loans made to Jojazak beginning in March 2007.[1] Oflye was a limited partner in three partnerships that made the loans to Jojazak, but the partnerships declined to bring suit.

Oflye tried its claims to the court, which rendered a judgment in favor of defendants under Code of Civil Procedure section 631.8.[2] The trial court concluded the applicable statute of limitations barred Oflye's claims and Oflye lacked standing to bring a direct action for the recovery of partnership assets.

Oflye argues the evidence was insufficient to find its claims were untimely. It also maintains it has standing to assert a direct claim for breach of fiduciary duty against its former trustee and, thus, standing to assert a related claim for unjust enrichment to recover the partnerships' funds from Jojazak. And Oflye challenges a pretrial order sustaining defendants' demurrers to its conversion cause of action. We find no error in the trial court's judgment. We affirm.

---

[1] Zachary's late father, Gerald Schneiderman, played a significant role in the events that led to Oflye's lawsuit. For clarity we refer to Zachary and Gerald by their first names.

[2] Statutory references are to the Code of Civil Procedure. Section 631.8 authorizes the trial court, as trier of the facts in a bench trial, to weigh the evidence and render a judgment for the moving party after the other party has completed its presentation of the evidence.

2

**FACTS AND PROCEDURAL BACKGROUND**

Consistent with our standard of review, we state the facts established by the evidence in the light most favorable to the judgment, indulging all presumptions and drawing all reasonable inferences in its favor. (*Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 140 (*Tusher*); *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Marriage of Arceneaux*).)[3]

### 1. *The Complaint*

On March 20, 2015, Seretti, on behalf of Oflye, filed this action against Zachary and Augustine. The operative second amended complaint asserts causes of action for breach of fiduciary duty and fraud against Zachary, and unjust enrichment against both defendants.[4] The claims are premised on an alleged

---

[3] Oflye did not object to the trial court's statement of decision or otherwise assert the statement failed to resolve a controverted issue. (See §§ 632, 634.) We therefore are bound by the doctrine of implied findings to presume the trial court made all factual findings necessary to support the judgment, and the only issue, as relates to the facts, is whether substantial evidence supports those findings. (*Tusher, supra,* 68 Cal.App.4th at p. 140; *Marriage of Arceneaux, supra,* 51 Cal.3d at pp. 1133–1134; see also *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267.)

[4] The second amended complaint also named Capital Asset Management Associates, Inc. (CAMA), a former trustee of Jojazak, and Pamela Mozer, a former trustee of Oflye and director of CAMA, as defendants. Oflye dismissed Mozer from the action before trial. CAMA, which apparently was a suspended corporation, did not participate in the trial.

The trial court sustained demurrers to a claim for conversion against both defendants and a claim for aiding and abetting breach of fiduciary duty against Augustine.

conspiracy whereby Zachary breached his fiduciary duty to Oflye and unjustly enriched Jojazak in connection with a real estate development project known as "Imani Fe."

According to the complaint, in September 2005, Seretti met with his attorney, Pamela Mozer, and her husband, Gerald Schneiderman, to discuss a possible investment in real property Gerald was acquiring for a future development known as "White Knoll." After the meeting, Seretti decided to use sale proceeds totaling approximately $1.4 million from a different real estate transaction to invest in White Knoll through a tax-deferred exchange.

As part of the proposed exchange, Mozer and Gerald suggested Seretti set up an irrevocable trust to take title to the White Knoll interest. In October 2005, the Oflye Trust was settled, naming Seretti's children as beneficiaries and Mozer as trustee.

In early 2006, Oflye completed a tax-deferred exchange to acquire the White Knoll property. As part of the transaction, Oflye took an undivided 86.93 percent interest in the property as a tenant in common with White Knoll Venture Ltd. (White Knoll LP), which owned the remaining 13.07 percent interest.

Creative Environments of Hollywood, Inc. (CEH) served as the general partner for White Knoll LP. Jojazak owned a 50 percent interest in CEH. CAMA (see fn. 4, *ante*), a company controlled by Gerald and Mozer, served as Jojazak's trustee.

---

Oflye also asserted a claim for accounting against all defendants, but did not pursue the claim at trial. Oflye does not challenge the dismissal of its aiding and abetting cause of action. We discuss the conversion claim later in this opinion.

4

Zachary, Gerald's son and Mozer's stepson, was a beneficiary of Jojazak.

In March 2006, Zachary became a co-trustee of Oflye with Mozer. In September 2006, the tenants in common—Oflye and White Knoll LP—obtained a $1 million loan secured by the White Knoll property (the White Knoll Loan). Zachary signed the loan documents on behalf of Oflye.

In November 2006, a company owned and controlled by Gerald and Jojazak undertook the Imani Fe project. To commence construction, the company needed to post a $1.75 million letter of credit or other similar security for a construction bond. The complaint alleges Gerald and Jojazak lacked sufficient capital to meet the obligation, and so they conspired with Zachary and Mozer—Oflye's co-trustees—to divert assets from Oflye's investments to finance Imani Fe.

In December 2007, Gerald allegedly convinced Seretti to "diversify" Oflye's initial investment in the White Knoll property by converting its tenant in common interest into a limited partner interest in White Knoll LP and then exchanging a portion of that interest for limited partner interests in Spring-Naud Associates, Ltd. (Spring LP) and 1800 Brand Associates, Ltd. (Brand LP). As with White Knoll LP, CEH served as the general partner for Spring LP and Brand LP.

The complaint alleges, from March to October 2007, Zachary and Mozer "issued and/or caused to be issued" checks from White Knoll LP to Jojazak totaling $950,000. In November 2007, Zachary and Mozer caused $1,050,491.03 to be transferred from Spring LP to Jojazak. Zachary and Mozer likewise caused Brand LP to transfer nearly $400,000 to Jojazak between October 2007 and July 2008. In 2009, Zachary and Mozer caused

5

Spring LP to transfer an additional $200,000 to Jojazak as part of the alleged conspiracy to finance Imani Fe.

According to the complaint, the Imani Fe project was completed in early 2010. At that time, the construction bond was exonerated and returned to Jojazak.

In 2013, Augustine became the trustee for Jojazak. He allegedly retained the borrowed funds and "knowingly refuse[d] to return [them] to Oflye."

The complaint alleges Seretti learned of the conspiracy in August 2014, when he received information about the Jojazak loans from the general partner for White Knoll LP, Spring LP, and Brand LP.

## 2. *The Trial*

After a series of demurrers and amended pleadings, the case proceeded to a bench trial against Zachary on the breach of fiduciary duty and fraud causes of action and against Augustine and Zachary on the unjust enrichment claim.

The evidence confirmed that, in March 2006, Oflye and White Knoll LP acquired the White Knoll property as tenants in common, with Oflye holding an 86.93 percent interest worth approximately $1.4 million. In September 2006, the tenants in common obtained a $1 million loan, secured by the White Knoll property, to fund the property's development. Zachary signed the loan documents as Oflye's co-trustee and personally guaranteed the White Knoll Loan. In 2007, Seretti authorized Zachary to "diversify" Oflye's investment by converting its tenant in common interest into limited partner interests in White Knoll LP, Spring LP, and Brand LP. Each of the limited partnerships was engaged in a different real estate development project in Los Angeles county.

6

CEH was the general partner for the three limited partnerships, as well as several other partnerships attached to different development projects. Gerald and his business partner, Manny Meza, ran CEH. Their respective family trusts—Jojazak for Gerald and the AC Trust for Meza—each owned a 50 percent share of the company. Zachary served as CEH's secretary and had authority to sign checks for the limited partnerships that CEH managed. Zachary was also a beneficiary of Jojazak and received distributions from the trust.

From 2006 to 2010, Seretti worked for CEH. He knew that Zachary had a management position and that Zachary handled financial matters for the company. While at CEH, Seretti sat in on meetings with the development team to review current projects, each project's stage of development, and the pipeline for new deals. During these meetings, Gerald often discussed CEH's plans for obtaining financing and raising equity for the different projects it managed.

It was a common practice, as directed by Gerald and Meza, for CEH to move money between its various development projects by lending one partnership's capital to Jojazak while having another partnership borrow the same funds from the trust. Gerald regularly talked about this practice and Zachary openly argued with him about it in CEH's office. Zachary worried the practice jeopardized the solvency of the projects and he urged Gerald to maintain sufficient reserves to ensure the partnerships' financial integrity.

Seretti was aware of CEH's practice of moving money between its various partnerships by lending capital to Jojazak. In April 2007, Seretti received an investor report and balance sheet for White Knoll LP that listed a loan to Jojazak for

7

$600,000. A second investor report, dated September 2007, showed the same $600,000 loan, while another report, in November 2007, disclosed the loan had increased to $950,000. Seretti likewise received investor reports for Spring LP and Brand LP disclosing loans to Jojazak of $1,138,238.56 and $335,000, respectively.

Seretti initially questioned Gerald and Zachary about the loans in late 2007. During another meeting in June 2008, Seretti confronted Gerald about the Jojazak loans and demanded financial information about Oflye's investments. Gerald told Seretti that CEH used Jojazak to lend and borrow money for the various projects and that the practice was beneficial to the limited partners because Jojazak had substantial equity in the partnerships and could pay a good interest rate on the borrowed funds. Although Seretti did not receive all the information he requested, he admitted he made no further inquiries about the loans or the partnerships' financial records after July 2008.

Around the same time in late 2007, CEH applied for a $13 million construction bond to continue work on Imani Fe. When the bond was denied, CEH negotiated a deal to deposit cash into escrow to secure construction financing that would keep the project moving forward. Concerns were raised internally at CEH, including with Zachary, about money moving out of the partnerships after CEH failed to secure the construction bond.

Seretti had heard about Imani Fe while working at CEH, but he knew little about how it was progressing. He was aware of the financial crisis and collapse of the real estate market in 2008, and he had spoken with Gerald about CEH's difficulty securing construction financing during the recession. Seretti was also openly concerned about the lack of progress on the development

8

projects in which Oflye had limited partnership interests. By November 2010, he had seen CEH lay off half of its staff.

However, on his last day with CEH, December 31, 2010, Seretti learned that an important milestone had been reached on Imani Fe and that Gerald anticipated an influx of funds to reinvigorate the company. At a New Year's Eve celebration that evening, Gerald told Seretti that, with the Imani Fe milestone hit, they would "have the funds to get other projects back on track." Seretti testified he was "surprise[d]" by Gerald's comment, but he did not ask Gerald anything further about the relationship between Imani Fe and CEH's other development projects.

Progress on the other projects apparently continued to stall and, in January 2012, Seretti learned his investment in White Knoll LP was at risk of being lost to a bank foreclosure. On January 17, 2012, CEH emailed a progress report to the White Knoll LP limited partners, including Seretti, reporting that due to a lack of cooperation from the city, the economic downturn, and the scarcity of construction financing, the partnership, "after having covered the mortgage payments for years, [was] finally unable to make these payments and the property fell into foreclosure approximately three months ago." The progress report continued: "We have also explored the possibility of selling the parcel in an effort to cut our losses, but have found that the Property is of little value without a building [and] . . . at this point, there has not been an acceptable prospect for the purchase of the property." On February 16, 2012, CEH sent Seretti another letter reporting, "The White Knoll project remains in foreclosure."

9

Seretti testified he was "alarmed" by news of the foreclosure and he contacted Mozer, who had become involved in CEH's operations following Gerald's death in December 2011, to find out what was happening with Oflye's investments. According to Seretti, Mozer told him she was "starting to find out all about the properties and the developments and she was starting to negotiate with banks to [obtain] refinancing." Despite the pending foreclosure and what Seretti already knew about the Jojazak loans and Gerald's practice of shifting funds between the various limited partnerships, Seretti testified that he felt comfortable with Mozer's response and that "things were moving forward." He admitted he took no further action until June 2012, when Mozer told him CEH was "having difficulty making [loan] payments." At that point Seretti followed up on his years-old request for financial information about the White Knoll LP, Brand LP, and Spring LP projects.

In fact, all three limited partnerships had multimillion dollar loans that fell into default and foreclosure. By March 2014, the lender had sold the real property asset securing each loan and had initiated deficiency actions against Jojazak (and Zachary with respect to the White Knoll Loan) for breach of written guaranties made for the benefit of White Knoll LP, Brand LP, and Spring LP. In November 2014, Zachary and Augustine, as trustee for Jojazak, agreed to pay the lender $900,000 to settle the deficiency actions.

In December 2014, Meza called a meeting of the investors in White Knoll LP, Brand LP, Spring LP, and the other limited partnerships CEH managed. Seretti testified it was the information presented at this meeting that first led him to believe there had been an "embezzlement of funds" from

the limited partnerships in which Oflye had invested.  Following the meeting, Seretti revisited the financial records he had received from CEH.  Three months later, he filed this lawsuit.

According to Seretti's damages expert, the loans CEH made on behalf of White Knoll LP and Spring LP to Jojazak deprived the partnerships of needed liquidity to service their debt obligations, resulting in the foreclosures and loss of the partnerships' principal assets.  As for the Brand LP loan to Jojazak, however, Seretti's expert admitted it had no effect on the project's failure or the partnership's ultimate bankruptcy.  Seretti's expert also acknowledged Oflye did not directly own any of the funds that it claimed as damages, all of the money lent to Jojazak had come from the limited partnerships, and Oflye possessed only a fractional interest in those partnership assets.

3.    ***The Judgment under Section 631.8***

After Seretti's presentation of evidence, Zachary and Augustine filed motions for judgment under section 631.8.  The defendants argued the statute of limitations barred Oflye's claims because Seretti was aware of the Jojazak loans as early as 2007 and 2008, and no later than 2010.  They also argued Oflye lacked standing to assert its claims because the funds at issue were partnership assets, and thus could be recovered through a direct action by the limited partnerships or a derivative action on behalf of the limited partnerships only.

After a hearing, the trial court granted the motions and entered judgment for Zachary and Augustine.  In its statement of decision, the court found Oflye could not invoke the discovery rule to delay accrual of its claims because the evidence showed Seretti had received numerous investor reports disclosing the Jojazak loans, he was actively involved in managing Oflye's investments,

11

and his work at CEH made him aware of the circumstances surrounding the loans by 2008 when he demanded detailed financial information from the general partner. The court also concluded Oflye lacked standing to bring a direct action against the defendants because the alleged injury resulted from Jojazak's failure to return funds that belonged to the three limited partnerships in which Oflye had a limited partner interest—not funds that belonged to Oflye. Even with respect to the breach of fiduciary duty claim against Zachary, the court reasoned Oflye could not establish causation because the damages were suffered by the limited partnerships, which had sole claim to the assets at issue. Finally, the court concluded Seretti failed to prove that Zachary committed fraud with respect to the Jojazak loans, or that he had been unjustly enriched by the transfers to Jojazak.

The trial court entered judgment for defendants on all causes of action. Seretti filed a timely notice of appeal.

## DISCUSSION

### 1. *Standard of Review*

"After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party . . . or may decline to render any judgment until the close of all the evidence." (§ 631.8, subd. (a).)

"The purpose of Code of Civil Procedure section 631.8 is 'to enable the court, when it finds at the completion of plaintiff's case that the evidence does not justify requiring the defense to produce evidence, to weigh evidence and make findings of fact.'

12

[Citation.] Under the statute, a court acting as trier of fact may enter judgment in favor of the defendant if the court concludes that the plaintiff failed to sustain its burden of proof. [Citation.] In making the ruling, the trial court assesses witness credibility and resolves conflicts in the evidence. [Citations.] [¶] On appeal, we view the evidence in the light most favorable to the judgment, and are bound by trial courts' findings that are supported by substantial evidence. [Citation.] But, we are not bound by a trial court's interpretation of the law and independently review the application of the law to undisputed facts." (*People ex rel. Dept. of Motor Vehicles v. Cars 4 Causes* (2006) 139 Cal.App.4th 1006, 1012.)

## 2. *The Statute of Limitations Bars Oflye's Claims*

"A plaintiff must bring a claim within the limitations period after accrual of the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*); § 312.) "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.] An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox,* at pp. 806–807.)

"The discovery rule protects those who are ignorant of their cause of action through no fault of their own. It permits delayed accrual until a plaintiff knew or should have known of the wrongful conduct at issue." (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 832 (*April Enterprises*).) "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. . . . So long as a suspicion exists, it is clear that the plaintiff must

13

go find the facts; she cannot wait for the facts to find her."
(*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111.)

We do not take a "hypertechnical approach" to the discovery rule. (*Fox, supra,* 35 Cal.4th at p. 807.) "Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Ibid.*)

" 'It is plaintiff's burden to establish "facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry." [Citation.] "[W]hether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide." ' " (*April Enterprises, supra,* 147 Cal.App.3d at p. 833; *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 437; see also *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 638 ["California law recognizes a general, rebuttable presumption, that plaintiffs have 'knowledge of the wrongful cause of an injury.' "].)

A three-year statute of limitations applies to a cause of action for fraud, as well as claims for breach of fiduciary duty and unjust enrichment based on fraud. (§ 338, subd. (d); *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 338 [three-year statute of limitations applies to unjust enrichment based on fraud or mistake]; *Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 963 ["limitations period is three years . . . for a cause of action for breach of fiduciary duty where the gravamen of the claim is deceit"]; cf. *City of Vista v. Robert Thomas Securities, Inc.* (2000) 84 Cal.App.4th 882, 889 [four-year statute of limitations applies to breach of fiduciary

duty, unless the gravamen of the claim is actual or constructive fraud, in which case the statute of limitations is three years].)

The evidence proved Seretti knew about the alleged wrongful fund transfers to Jojazak, and about CEH's practice of using Jojazak to shift capital between the various limited partnerships, as early as 2007 or 2008. From April 2007 to January 2008, Seretti admitted he received and reviewed investor reports and balance sheets showing a $950,000 loan to Jojazak from White Knoll LP, a $1,138,238.56 loan to Jojazak from Spring LP, and a $335,000 loan to Jojazak from Brand LP.[5] Thus, by 2008, Seretti knew CEH had transferred capital to Jojazak far in excess of Oflye's $1.4 million investment in those limited partnerships.

During this period, Seretti also worked for CEH, where the practice of using Jojazak to move money between the limited partnerships was openly discussed. By June 2008, Seretti had twice confronted Gerald about the Jojazak loans, and Gerald had told Seretti CEH was indeed using Jojazak to move money between its development projects, including the limited partnership projects in which Oflye had an interest. But despite demanding financial information that was not fully provided, Seretti admitted he took no further action to ensure Oflye's investments remained solvent, even while, in the midst of the recession, Gerald told him CEH was having difficulty securing capital for its projects and while he witnessed the company lay off half its workforce. Based on these compounding

---

[5] From February 2008 to November 2010, Seretti received additional investor reports with balance sheets for each of the limited partnerships reflecting ongoing loans to Jojazak in different and fluctuating amounts.

business irregularities, coupled with CEH's tenuous financial condition and the stalled progress of its projects, the trial court reasonably concluded Seretti knew or should have known that capital from the limited partnerships may have been illicitly diverted and that Oflye's investments were in jeopardy. (See, e.g., *Vertex Inv. Co. v. Schwabacher* (1943) 57 Cal.App.2d 406, 415–416 [evidence established stockholders' lack of diligence in failing to discover comingling of company funds where defendant's conduct was "such a departure from common business practice" that it should have prompted investigation; observing, "[i]f a request for a statement or audit had been made, a failure on the part of [defendant] to comply would arouse a strong suspicion of irregularity"].)

Critically, in 2010, Seretti also learned of Imani Fe's apparent connection to the Jojazak loans. At the heart of Oflye's operative complaint is an alleged conspiracy between Zachary, Gerald, and Jojazak to finance Imani Fe through the fraudulent embezzlement of funds from Oflye's investments, which ultimately led to the insolvency of White Knoll LP, Brand LP, and Spring LP. The evidence showed Gerald essentially disclosed this purported scheme to Seretti at the end of 2010, when he told Seretti the completion of a milestone for Imani Fe meant money would be freed up to "get other projects back on track." Seretti testified the implication of Gerald's statement "surprise[d]" him. But, despite having concerns about Oflye's investments, Seretti admitted he made no further inquiry about the connection between those development projects and Imani Fe. In view of everything Seretti knew by 2008, and certainly by the end of 2010, the trial court reasonably concluded Seretti had "reason

16

to at least suspect that a type of wrongdoing ha[d] injured" Oflye's investments. (*Fox, supra,* 35 Cal.4th at p. 807.)

On appeal, Seretti contends his knowledge of the Jojazak loans was insufficient to trigger the accrual of Oflye's claims because he "had no notice that they were not paid until December 2014." The contention overlooks everything else Seretti knew about the circumstances of the loans, the progress of the relevant development projects, and the financial condition of the limited partnerships. Most significantly, it overlooks Oflye's own theories of causation and damages in this action. According to the testimony of Oflye's damages expert, Oflye was injured when, as a result of the transfers to Jojazak, the relevant limited partnerships were unable to service their debts and lost their principal assets to foreclosure. As discussed, the evidence proved Seretti was aware of this risk at least by 2010, when Gerald told him about CEH's difficulty securing capital for its projects. But there was more. As the trial court emphasized in its statement of decision, by January 2012, Seretti had received a progress report explicitly informing him that White Knoll LP was unable to make its mortgage payments and that "the property fell into foreclosure approximately three months ago." The report advised Seretti that the partnership had "explored the possibility of selling the parcel . . . to *cut our losses,* but [we] have found that the Property is of *little value* without a building thereon." (Italics added.) The evidence supports the trial court's finding that Seretti knew of Oflye's purported injury, and that the allegedly wrongful loans to Jojazak might be its cause, more than three years before this action was filed in March 2015. (See *Davies v. Krasna* (1975) 14 Cal.3d 502, 514 ["the infliction of appreciable and actual harm,

17

however uncertain in amount, will commence the statutory period"].)

Finally, Seretti argues Zachary's status as Oflye's trustee excused any failure to investigate and thus delayed accrual until Seretti "actually discovered the facts" constituting Oflye's causes of action. (See *Hobbs v. Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 202 ["Where there is a fiduciary relationship, the usual duty of diligence to discover facts does not exist" and "the limitations period does not begin to run until [the plaintiff] *actually* discovers the facts constituting the cause of action."].) The contention again overlooks all that Seretti actually knew. As discussed, the evidence established Seretti had actual knowledge of the fund transfers to Jojazak; CEH's practice of using Jojazak to move funds between its various limited partnerships; Gerald's use of this practice to finance work on Imani Fe; the solvency risk the relevant limited partnerships faced; and, ultimately, the foreclosure actions that, according to Oflye's theory, resulted in the loss that Oflye claimed as damages. The evidence supports the trial court's conclusion that the statute of limitations bars Oflye's claims.

3.    ***Oflye Lacked Standing to Pursue a Direct Action for the Recovery of Partnership Assets***

Oflye's failure to bring its claims within the prescribed limitations period is alone sufficient to affirm the judgment on the claims adjudicated in the trial. Nevertheless, we will briefly address the standing issue because it too provides a categorical basis, independent of the statute of limitations, to affirm the judgment.

Under California law, "every action must be prosecuted in the name of the real party in interest." (*Wallner v. Parry*

18

*Professional Bldg., Ltd.* (1994) 22 Cal.App.4th 1446, 1449 (*Wallner*), citing § 367.) Because the partnership entity is the owner of partnership property, the real party in interest on claims for damage to partnership property is the partnership— not the individual partners. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2020) ¶ 2:15.5; *Wallner*, at p. 1449; see also Corp. Code, § 15901.04, subd. (a) ["A limited partnership is an entity distinct from its partners."]; *id.,* § 16501 ["A partner is not a coowner of partnership property and has no interest in partnership property that can be transferred, either voluntarily or involuntarily."].) "Individual partners may not sue for damage to the partnership property or to their individual 'beneficial interest' in the property." (Weil & Brown, ¶ 2:15.5; *Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 60 (*Mayer*).)

When the gravamen of the complaint is injury to the limited partnership, or where the action seeks to recover assets of the partnership, an individual partner must bring a "derivative action," naming the partnership as a defendant, for the benefit of the limited partnership. (*Wallner, supra,* 22 Cal.App.4th at p. 1449; see *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108; *Schuster v. Gardner* (2005) 127 Cal.App.4th 305, 312 [" '[A] shareholder *cannot* bring a direct action for damages . . . on the theory their alleged wrongdoing decreased the value of his or her stock (e.g., by reducing corporate assets and net worth). The corporation itself must bring such an action, or a derivative suit may be brought on the corporation's behalf.' "].) A "cause of action is individual, not derivative, only ' "where it appears that the injury resulted from the violation of some special duty owed the stockholder by the wrongdoer and having its origin

19

in circumstances *independent of the plaintiff's status as a shareholder.*" ' " (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 124, italics added.)

As Oflye's damages expert confirmed, it is undisputed that Oflye had no direct ownership interest in any of the assets it claimed as damages, all of the money transferred to Jojazak had come from the limited partnerships, and Oflye possessed only a fractional interest in the partnerships. Based on these admissions and undisputed evidence, the trial court correctly concluded that "[a]ny purported claim to the moneys the Jojazak Trust allegedly received from the limited partnerships belongs solely to those limited partnerships" and Oflye has "no standing" to bring a direct action for recovery of those partnership assets.

*PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958 (*PacLink*) is instructive. In *PacLink*, members of a limited liability company (LLC) filed suit against several business entities and individuals alleging the LLC's assets were transferred without the plaintiff's knowledge or consent and without paying any consideration to the plaintiffs. (*Id.* at p. 961.) The plaintiffs alleged " ['t]he fraudulent transfers and the conversion of the "sale" proceeds rendered [the LLC] insolvent and thereby defrauded plaintiffs by preventing them from being paid for their Ownership Interests in [the LLC].' " (*Id.* at pp. 961–962, italics omitted.) The defendants demurred to claims for fraudulent transfer, conspiracy to commit conversion, and imposition of a constructive trust, arguing the plaintiffs lacked standing because they could "not claim any direct injury or loss suffered by them," since the gravamen of the claims was that the LLC's assets had been diminished. (*Id.* at p. 962.) The trial court overruled the demurrer, concluding the plaintiffs were

" 'attempting to recover [for] their personal injury, as [opposed] to injury to the LLC.' " (*Id.* at p. 963.) The reviewing court issued a writ directing the trial court to sustain the demurrer without leave to amend. (*Id.* at p. 966.)

The *PacLink* court explained: "[T]he essence of plaintiffs' claim is that the assets of [the LLC] were fraudulently transferred without any compensation being paid to the LLC. This constitutes an injury to the company itself. *Because members of the LLC hold no direct ownership interest in the company's assets [citation], the members cannot be directly injured when the company is improperly deprived of those assets.* The injury was essentially a diminution in the value of their membership interest in the LLC occasioned by the loss of the company's assets. Consequently, any injury to plaintiffs was incidental to the injury suffered by [the LLC]." (*PacLink, supra,* 90 Cal.App.4th at p. 964, fn. omitted, italics added.) Because the " 'gravamen of the complaint' " was " 'injury to the whole body of [the LLC's members],' " the *PacLink* court concluded " 'it was for the [LLC] to institute and maintain a remedial action.' " (*Id.* at p. 966.) If the responsible officials refused or failed to act, the plaintiffs' only recourse was a "derivative action" to restore the assets to the LLC. (*Ibid.*)

Like the claims in *PacLink*, the essence of Oflye's lawsuit is that assets of the limited partnerships in which Oflye held an interest were improperly "loaned" to Jojazak and never repaid. According to Oflye's damages expert, Oflye was damaged when, as result of the fraudulent loans, the partnerships were unable to service their debts and lost their principal assets to foreclosure, rendering Oflye's partnership interest worthless and its capital contribution lost. This was an injury to the whole body of the

21

limited partnership—not one exclusively borne by Oflye. Indeed, like Oflye, every limited partner suffered the same injury—loss of their capital contribution—due to the partnerships' insolvency. And, like every limited partner, any injury to Oflye was necessarily "incidental" to the injuries suffered by the limited partnerships in which Oflye maintained an interest. (*PacLink, supra,* 90 Cal.App.4th at p. 964.)

On appeal, Seretti argues "Oflye is a trust and is seeking relief for the breaches of fiduciary duty by *its trustee . . .* and against . . . the successor trustee of Jojazak, which received the fruits of those breaches and which he continues to hold on to on its behalf." He contends these claims "uniquely" belong to Oflye and not to the limited partnerships, "which have no claim for the Oflye trustee['s] breaches of duty and Jojazak's participation therein."

Seretti's argument ignores that Oflye suffered no injury from Zachary's alleged breach of fiduciary duty because Oflye had no direct ownership interest in the partnership assets that were transferred to Jojazak. (See *PacLink, supra,* 90 Cal.App.4th at p. 964 ["Because members of the LLC hold no direct ownership interest in the company's assets [citation], the members cannot be directly injured when the company is improperly deprived of those assets."].) Regardless of whether Zachary's participation in the Jojazak loans constituted a breach of fiduciary duty, the undisputed evidence established Oflye did not loan money to Jojazak and Jojazak had no obligation to repay the loans to Oflye. Thus, while the limited partnerships may have no claim against Zachary for the breach of a fiduciary duty owed to Oflye, it is also the case that Oflye can make no claim for the recovery of *partnership assets* by recasting the *partnerships'* claims for

22

unpaid loans as an individual claim for breach of fiduciary duty. (See *Mayer, supra,* 98 Cal.App.4th at p. 60 [limited partners "could not have sued individually for damage to their individual 'beneficial interest' in partnership property"].)

Oflye suffered no direct injury from the allegedly improper loans. Its injury, like that of every other limited partner, was "occasioned by the loss of the [partnerships'] assets" and was necessarily "incidental" to the injuries *the partnerships* suffered. (*PacLink, supra,* 90 Cal.App.4th at p. 964.) The trial court correctly determined Oflye does not have standing to bring a direct action for damage to the partnerships. (Cf. *Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525, 530–532 [plaintiff could assert direct action for fraud that induced him "*to form and invest in a corporation*" because his individual "injury resulted from the formation of [the] corporation and investments therein to carry on a project that could not be conducted because of the fraud," and that injury was distinct from the injury the corporation suffered from the diminished value of its assets].)

4. ***Oflye Cannot State a Claim for Conversion of the Limited Partnerships' Assets***

Before trial, the court sustained Zachary's and Augustine's demurrers to Oflye's conversion cause of action without leave to amend. The ruling was correct.

"Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066; *Hodges v. County of Placer* (2019) 41 Cal.App.5th 537, 551–552; see also *Voris v. Lampert* (2019)

23

7 Cal.5th 1141, 1150.) To state a claim for conversion, the plaintiff must allege facts sufficient to prove he was "entitled to immediate possession [of the property] at the time of conversion." (*Hartford Financial Corp. v. Burns* (1979) 96 Cal.App.3d 591, 598 (*Hartford Financial*), italics omitted.)

In support of Oflye's conversion claim, the operative complaint alleges Zachary and Mozer, "without any authorization to do so and in breach of their fiduciary duties to Oflye, transferred the funds invested in [White Knoll LP], Spring [LP], and Brand [LP] by Oflye in the amount of $1,405,617.12 directly to Jojazak." The complaint alleges "Jojazak has never had any right to the funds" it received.

Oflye's conversion claim fails for the same reason it lacked standing to assert its other claims—namely, the complaint's allegations admit (and the evidence at trial proved) the allegedly converted assets belonged to the limited partnerships and Oflye was not entitled to immediate possession of those assets at the time of the alleged conversion. (See *Hartford Financial, supra,* 96 Cal.App.3d at p. 598.)

On appeal, Seretti suggests this straightforward analysis fails to appreciate the "more subtle and complex" conception of property under the current doctrine of conversion. Citing *Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202 (*Welco*), he maintains the conversion here was "effected" by diverting "monies and/or property . . . from the limited partnerships into which Oflye's [property] had been 'diversified,' " and this, although not constituting the "physical conversion of anything," was akin to the defendant's use of the plaintiff's credit card in *Welco* to convert money into the defendant's

bank account.  (See *Welco,* at p. 211.)  The argument misunderstands the problem with Oflye's conversion claim.

The problem with Oflye's claim is not that the property at issue is intangible.  Rather, the problem is, unlike the plaintiff in *Welco*, Oflye had no immediate right to possession of the property because the property belonged to *the limited partnerships*—not to Oflye.  (Cf. *Welco, supra,* 223 Cal.App.4th at p. 211 [approving conversion claim where the defendant "wrongfully caused a charge to *plaintiff's credit card account* by having a specific sum of money paid through defendant's credit card terminal into defendant's bank account" (italics added)]; see Corp. Code, § 16501 ["A partner is not a coowner of partnership property and has no interest in partnership property that can be transferred, either voluntarily or involuntarily."]; see also *id,* § 16502 ["The only transferable interest of a partner in the partnership is the partner's share of the profits and losses of the partnership and the partner's right to receive distributions."].)  Because Oflye did not own the property that was allegedly converted, the trial court correctly sustained defendants' demurrers to the conversion claim without leave to amend.

## DISPOSITION

The judgment is affirmed.  Defendants Zachary Schneiderman and Michael Augustine are entitled to their costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



EDMON, P. J.



LAVIN, J.