Filed 10/17/23  Pollock v. Macdonald CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA


| | |
|---|---|
| DAVID POLLOCK, | D080710 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2018-00063633-CU-FR-NC) |
| JENNIFER ANN MACDONALD, | |
| Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of San Diego County, Blaine K. Bowman, Judge.  Affirmed.

Jennifer Macdonald, in pro. per., for Defendant and Appellant.

CL Ludmer and Christopher L. Ludmer, for Plaintiff and Respondent David Pollock.

Defendant Jennifer Macdonald appeals from a judgment entered against her after a jury trial and a post-judgment order denying her motion for new trial, for judgment notwithstanding the verdict, and to vacate the judgment.  The jury found in favor of plaintiff David Pollock on his claims for breach of contract, money had and received, conversion, and unjust

enrichment, and the trial court ruled in Pollock's favor on his promissory estoppel claim. We find no error and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[1]

A. *The Underlying Dispute*

Pollock and Macdonald were an unmarried couple who dated for less than one year, from approximately November 2017 to September 2018. The two were never engaged and, according to Pollock, never discussed marriage. During the relationship, Pollock worked in information technology, splitting his time between Chicago and San Diego, and Macdonald was a registered nurse and real estate investor living in San Diego.

When Pollock and Macdonald began their relationship, Macdonald already owned one rental income property in Hawaii. She bought a second property in Hawaii soon after the two started dating. A few months into the relationship, Macdonald raised the idea of buying a third rental property together with Pollock, suggesting that the two of them purchase the penthouse unit that was for sale in the same building as her second rental property.

In June 2018, Pollock and Macdonald decided to submit an offer of $450,000 to jointly purchase the penthouse unit. Around the same time, the couple discussed the way they would structure their joint investment. They agreed to each put in half of the purchase amount; that they would split the revenue from the rental of the property equally; that they would hold onto

---

[1] As we will discuss in more detail, a full day of trial testimony was omitted from the appellate record in this case. Pollock filed a motion to augment the record, which we grant only as to the documents that were filed or lodged with the trial court in this case. (See Cal. Rules of Court, rule 8.155(a).) However, the augmented record does not contain the missing trial testimony. We therefore provide a statement of facts based on the incomplete record before us.

the property for approximately seven to ten years to earn the rental income from it and allow it to appreciate in value; and that when they eventually sold the property, they would recoup their initial investment. Pollock suggested that the title be solely in Macdonald's name to allow the purchase to move more quickly, as he was spending much of his time in Chicago and unavailable much of the time due to work. He therefore thought it logical to give Macdonald the ability to speak on the couple's behalf and allow her to more quickly handle any problems that arose as they moved forward with the transaction. She ultimately used the name of her trust on the property title rather than her individual name, which Pollock was fine with.

The couple agreed that Macdonald would manage the day-to-day affairs of the property, as she was already familiar with how to do so given her ownership of other rental properties in Hawaii. They also agreed that Macdonald would handle any expenses to facilitate the management of the property and would pay for those expenses out of her portion of the rental income. In exchange, Macdonald would keep any capital gains from the eventual sale of the property.

Pollock and Macdonald agreed to open a joint checking account to hold all money relating to the penthouse, including any expenses and rental income. They each put $230,000 into the account to cover their half of the purchase price ($225,000 each) plus an additional $5,000 each to cover closing expenses, property taxes, and other initial expenses necessary to complete the transaction. They agreed that the rental income would be split equally between the two of them.

The parties initially used the term "investment" to describe Pollock's monetary contribution to the penthouse purchase, but they soon began describing the money as a "loan" given that Macdonald would be the only one

on the property title. Macdonald agreed that Pollock's $230,000 was a loan to be repaid when the couple sold the property, and she promised before purchasing the property that she would repay his loan.

The parties did not put any of these terms or their agreement in writing. Pollock did not ask Macdonald to sign a promissory note for his loan.

Though no third parties witnessed any conversations about the couple's agreement regarding their joint investment, Macdonald referred to the money from Pollock as a loan in writing to Pollock and others. In an email to the property broker in June 2018, Macdonald wrote that Pollock was "going to lend [her] $200,000, but as the loan" for the purchase of the penthouse. In another email to Pollock, Macdonald asked him: "Can you take a picture of one of your bank account that has at [*sic*] 100,000 - 200,000 with a note you are loaning me funds[?]"

Pollock did in fact deposit $230,000 into the parties' joint checking account in July 2018. He soon after informed his sister that he had purchased a rental property in Hawaii as a way to set himself up for retirement. In a later email exchange between Pollock and Macdonald, Macdonald referred to the penthouse as "our condo."

In September 2018, Pollock told Macdonald that he did not see a future with her and wanted to break up. Macdonald was very angry and said she did not want to see or speak to Pollock again. A couple of weeks later, Pollock approached Macdonald about potentially selling the penthouse to one of his friends. Macdonald refused, stating that she wanted to stick to the original plan of keeping the property as a long-term investment for seven to ten years. At some point after this conversation, Macdonald closed the parties' joint bank account.

In October 2018, Pollock suggested to Macdonald that, to simplify things and make their transactional relationship less stressful, she could pay him a flat interest amount on the loan in lieu of having to calculate his portion of the rental income each month. Macdonald texted him to say she would think about it later.

In an email the following day, Macdonald stated for the first time that she thought the $230,000 from Pollock was a gift, because he never asked her for a promissory note, contract, or property agreement and he had stated that he did not want his name on anything. She also claimed Pollock never discussed any terms related to the money. Pollock responded in part: "I didn't think you would actually try to steal my money."

In September 2019, Macdonald sold the Hawaii penthouse for $530,000. She did not pay Pollock back his $230,000 loan, nor did she pay him any of the rent she had received from the penthouse.

B. *Trial Court Proceedings*

In December 2018, Pollock filed the initial complaint in this case alleging causes of action for (1) breach of oral contract, (2) fraudulent inducement, (3) promissory estoppel, (4) money had and received, (5) conversion, and (6) unjust enrichment. He sought compensatory, exemplary, and punitive damages. In April 2019, MacDonald filed a cross-complaint, though she ultimately dismissed it.

Trial began on March 17, 2022, proceeded on March 21 and March 22, and concluded on March 23. On March 21, the second day of trial, Macdonald did not appear in the courtroom. A courthouse deputy sheriff explained to the court that in the main lobby of the courthouse that morning, Macdonald had clenched her chest and leaned against the wall, exhibiting early signs of a heart attack such as sweating profusely and breathing heavily. The deputy

5

called for medics, who assessed Macdonald and determined that because of her symptoms and a pre-existing heart condition, she should be taken to the hospital. The court determined that the trial would proceed for the day, and the court would get an update from Macdonald the next day to see how she was feeling. Macdonald's attorney was present during this exchange and noted that although Macdonald was a witness, the parties probably would not get to her testimony that day in any event. He did not object to proceeding in Macdonald's absence or request a trial continuance. Pollock was then sworn in to testify.

According to the March 22, 2022 trial minute order and partial transcript, Macdonald again failed to appear in the courtroom on the third day of trial. The minute order reads: "8:59 a.m. Prior to the start of trial and outside the presence of the jury, the clerk receives a message from Jennifer Macdonald. Court and counsel listen to the message. [¶] 9:04 a.m. Jennifer Macdonald is present on the telephone outside the presence of the jury. As reported in the notes of the court reporter, Defendant waives her presence for the remainder of the trial."

During the telephone conversation that took place on the record, Macdonald told the trial court judge that she had spent the night in the hospital and was undergoing a four-hour cardiology test. The court noted for the record that Macdonald had a medical emergency and therefore would not be held in contempt for failing to appear for trial. The court informed Macdonald that she had the right to testify but was not required to do so and explained that, with her authorization, the trial could proceed in her absence with her attorney representing her interests. The court offered several different options, but Macdonald stated several times that she wished for the trial to proceed without her. Before hanging up, the court once more

6

confirmed Macdonald's decision: "Then we will -- with your consent then, Ms. Macdonald, I do find that you understand you do have the right to testify on your own behalf and that you're giving up that right and that [your attorney] will represent you during the course of the trial. And that's correct, right?" Macdonald responded: "Okay. Yes."

Trial then proceeded. According to the minute order, Pollock continued his testimony, the deposition of witness Gayle D. was read into the record, excerpts from Macdonald's deposition were read into the record, and counsel for each party presented closing argument. The court then instructed the jury, and the jury began deliberating.

The next day, the jury returned a verdict in favor of Pollock on his claims for breach of contract, money had and received, conversion, and unjust enrichment. The jury found in favor of Macdonald on Pollock's fraud claim. The court also ruled in favor of Pollock on his promissory estoppel claim. The judgment issued by the court stated that Pollock would recover damages in the amount of $385,023.50 and punitive damages in the amount of $250,000, for a total recovery of $635,023.50.

After entry of judgment, Macdonald moved for a new trial, for judgment notwithstanding the verdict, and to vacate the judgment. The trial court found Macdonald's motions both procedurally defective and substantively without merit, and it denied them all. Macdonald timely appealed.

DISCUSSION

I

We note as an initial matter that Macdonald appears to have forfeited her arguments on appeal by failing to provide a complete record. As the Supreme Court has explained, "[i]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct

7

and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.) It follows that the appellant has the burden of providing an adequate record on appeal, and if the record is inadequate for meaningful review, the decision of the trial court should be affirmed. (*Id*. at p. 609.) In other words, " '[f]ailure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' " (*Ibid*.; see also *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 [declining to consider the merits of the plaintiff's cross-appeal where he failed to provide an adequate record].)

Here, the appellate record is missing a significant portion of the trial testimony, as it does not contain the reporter's transcript from March 22, 2022, the third day of a four-day trial that contained only two days' worth of testimony. Pollock submitted a request to augment the record that includes a partial transcript containing the contents of the telephone call that took place among the court, the parties, and counsel on March 22, but the augmented record omits testimony from Pollock, the deposition testimony of witness Gayle D. and Macdonald that was read into the record, and closing arguments. It is unclear whether Macdonald intended to or did correctly designate a complete trial transcript, but the fact remains that the record before us is incomplete.

Numerous appellate courts have declined to reach the merits of a claim raised on appeal due to the absence of a reporter's transcript, and we would be justified in doing so here. (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186–187 (*Foust*) [concluding that the incomplete record submitted by the defendant was fatal to the appeal].) It was Macdonald's burden as appellant to supply an adequate record from which we could

determine whether reversal is appropriate, and she has failed to do so. Nevertheless, we will exercise our discretion to address the merits of Macdonald's claims to the extent permitted by the partial record before us.

II

A. *The Trial Court Did Not Err in Proceeding with Trial in Macdonald's Absence*

Macdonald first contends that she was "forced into waiving her rights . . . from her hospital bed in the Cardiac Intensive care unit" after experiencing a medical emergency and that her attorney was therefore "improperly forced to appear alone" without her. According to Macdonald, this constituted a denial of a trial continuance and was an abuse of discretion that deprived her of her due process rights. We disagree.

A party's right to be present at trial is not absolute—it may be expressly or impliedly waived. (*People v. Espinoza* (2016) 1 Cal.5th 61, 72; see also *Whalen v. Superior Court* (1960) 184 Cal.App.2d 598, 600–601.) We conclude that Macdonald waived this right, and nothing in the record indicates that she was "forced" to do so. To the contrary, Macdonald expressly and repeatedly confirmed that she wanted the trial to proceed without her. During the telephone conversation among the parties and the trial court recorded by the court reporter, the court informed Macdonald that she had the right to testify but was not required to do so. Macdonald stated that she thought that "would probably be easier" since she did not know what would happen next after her cardiology test. The court offered to proceed with trial for the day and check back in with Macdonald to see if she was able to appear at trial the following day. Macdonald declined, saying: "You know, I don't feel well at all. I don't really think I would be there in the morning."

The court then asked Macdonald to confirm that it was her request that the trial proceed without her and that her attorney represent her interests in

9

her absence. Macdonald answered, "Yes." The court then reiterated that Macdonald had other options: "We do have the option of having you testify remotely if you want, but you're telling me that you would prefer not to testify at all. Is that correct?" Macdonald again confirmed that this was correct. Before ending the telephone call, the court once more confirmed Macdonald's decision: "Then we will -- with your consent then, Ms. Macdonald, I do find that you understand you do have the right to testify on your own behalf and that you're giving up that right and that [your attorney] will represent you during the course of the trial. And that's correct, right?" Macdonald responded: "Okay. Yes." Based on this record, it is clear that Macdonald expressly waived her right to be present in the courtroom during her trial.

Moreover, at no point did Macdonald or her attorney request a trial continuance based on her alleged medical emergency.[2] The single case cited by Macdonald in support of her argument is therefore inapposite. (See *Vann v. Shilleh* (1975) 54 Cal.App.3d 192, 195–196 [finding it an abuse of discretion to deny the defendants' request for a trial continuance after attorney withdrew on the eve of trial].) We conclude that the trial court did not err in proceeding with trial in Macdonald's absence.

B. *Macdonald Was Estopped from Asserting the Statute of Frauds*

Macdonald's next contention is that no oral contract existed between her and Pollock, but even if there was, it is unenforceable. She argues that because the agreement relates to real estate and was to be performed over

---

[2]    We also note that the trial court specifically found Macdonald not to be credible in terms of her purported health condition, concluding that she had engaged in "antics designed to delay Plaintiff from having his day in court."

10

the course of seven to ten years, the statute of frauds required their agreement to be in writing.

Pollock responds that the statute of frauds does not apply here because he performed all of his obligations under the parties' agreement and Macdonald is estopped from asserting the statute of frauds.[3] He further argues that Macdonald waived the statute of frauds defense by failing to object to evidence of the contract presented at trial or to request a jury instruction on the defense, and that even if the jury had found in favor of Macdonald on the defense, her liability and damages would remain the same given the jury's verdict on Pollock's claims for money had and received, unjust enrichment, and conversion, and the court's ruling on his promissory estoppel claim.

We agree with Pollock on his first argument and therefore need not reach the others. Civil Code section 1624 provides that an "agreement that by terms is not to be performed within a year from the making thereof" is invalid unless in writing. (Civ. Code, § 1624, subd. (a)(1).) But even "[a]ssuming that the agreement in the present case falls within this provision of the statute of frauds, the finding of the trial court that [Pollock] had fully performed all of his obligations under the contract operates to remove the bar of the statute [of frauds]." (*Dutton v. Interstate Inv. Corp.* (1941) 19 Cal.2d 65, 70; see also *Dougherty v. California Kettleman Oil Royalties, Inc.* (1937) 9

_____

[3] Pollock addresses full performance and equitable estoppel as separate arguments. Because the principle that one party's full performance removes an oral agreement from the statute of frauds is based on principles of estoppel, we consider the arguments together. (See *Monarco v. Lo Greco* (1950) 35 Cal.2d 621, 623–624 ["The doctrine of estoppel to assert the statute of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances."].)

11

Cal.2d 58, 81 ["complete performance by [plaintiff] . . . clearly create[s] an estoppel to plead the statute"]; *Zakk v. Diesel* (2019) 33 Cal.App.5th 431, 454 [concluding that plaintiff's "allegation that he fully performed all of his obligations under the alleged oral or implied-in-fact contract was sufficient to take the contract out of the statute of frauds"].)

Here, the parties orally agreed that they would each pay half of the purchase amount of the penthouse, split the rental income from the property equally, and, when they eventually sold the property, recoup their initial investment, with any additional profit going to Macdonald. Pollock fully performed his part of the agreement by depositing $230,000 into the parties' joint checking account in July 2018. We therefore conclude that Macdonald is estopped from arguing that the parties' oral contract is barred by the statute of frauds.

## C. *The Economic Loss Rule Is Inapplicable*

Macdonald also contends that Pollock's second through fifth causes of action—fraudulent inducement, promissory estoppel, money had and received, and conversion—should have been dismissed because they are barred by the economic loss rule. According to Macdonald, Pollock failed to demonstrate that she owed any duty independent of the parties' contract, and he therefore may not recover tort damages in what is essentially a breach of contract case. We are not persuaded.

The economic loss rule generally prohibits recovery in tort for negligently inflicted financial harm unaccompanied by physical or property damage. (*Sheen v. Wells Fargo Bank N.A.* (2022) 12 Cal.5th 905, 922–923 (*Sheen*).) In breach of contract cases, the rule serves to protect the contractual bargain made by the parties and " 'prevents the erosion of

12

contract doctrines by the use of tort law to work around them.'" (*Id.* at p. 923.)

But not all tort claims for monetary loss between contractual parties are barred by the economic loss rule. (*Sheen*, *supra*, 12 Cal.5th at p. 923.) The Supreme Court has repeatedly held that tort damages are available in breach of contract cases where "the breach is accompanied by a traditional common law tort, such as fraud or conversion," the means used to breach the contract are tortious, or a party intentionally breaches the contract with the intent or knowledge that the "breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990, internal quotation marks omitted (*Robinson*); *Erlich v. Menezes* (1999) 21 Cal.4th 543, 553–554 (*Erlich*).) As the Court has explained, "[f]ocusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated." (*Robinson*, at p. 990; *Erlich*, at p. 554.)

Applying these principles to the causes of action Macdonald contends are barred, we find the economic loss rule inapplicable. First, although Macdonald appears to include Pollock's fraudulent inducement claim in her argument, the jury actually found in favor of Macdonald on that cause of action, so it is not at issue on appeal. Second, two of the claims about which Macdonald complains—promissory estoppel and money had and received—sound in contract rather than tort, as they are based upon breach of a promise. (*Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 958.) The economic loss rule therefore does not apply to these claims.

As for Pollock's conversion claim, the Supreme Court has made clear that tort damages are recoverable by a party to a breached contract where

13

the breach is accompanied by conversion. (*Robinson*, *supra*, 34 Cal.4th at p. 990; *Erlich*, *supra*, 21 Cal.4th at p. 553.) This makes sense, as the many reasons for adhering to the distinction between contract and tort remedies have no bearing on a claim for conversion, which is a strict liability tort arising independent of the contract. (See *Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 208–209.) The jury here found that the evidence was sufficient to establish liability for conversion. Macdonald does not argue otherwise. We therefore conclude that the economic loss rule does not bar Pollock from recovering tort damages.

D. *The Trial Court Did Not Err in Awarding Punitive Damages*

Macdonald's final argument on appeal is that the trial court erred in allowing Pollock to recover punitive damages in the absence of sufficient evidence of her financial condition. We reject this argument. As we have explained, "the cardinal rule of appellate review [is] that a judgment or order of the trial court is presumed correct and prejudicial error must be affirmatively shown." (*Foust*, *supra*, 198 Cal.App.4th at p. 187.) Without a complete reporter's transcript, we cannot undertake a meaningful review of Macdonald's argument that the evidence was insufficient to support an award of punitive damages, because we do not have record of precisely what evidence was presented to the jury. (See *ibid*.) We must therefore presume that the trial court correctly determined that sufficient evidence supported the jury's award of punitive damages.

Moreover, an attack on the sufficiency of the evidence on appeal without a fair statement of the evidence presented at trial is not entitled to consideration. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Appellants who challenge the trial court's decision based upon the absence of substantial evidence are required to set forth all the material evidence on the

issue—not merely their own evidence, as Macdonald did here.  "Unless this is done the error is deemed waived."  (*Ibid*.)  Macdonald is not exempt from this rule merely because she is representing herself in propria persona on appeal.  Her claims of insufficiency of the evidence are unsupported by citation to the reporter's transcript, and her recitation of facts fails to discuss all evidence material to her contentions.  We therefore find that Macdonald has waived her sufficiency of the evidence argument on appeal.

DISPOSITION

The judgment and post-judgment order are affirmed.  Pollock is entitled to his costs on appeal.

BUCHANAN, J.

WE CONCUR:

HUFFMAN, Acting P. J.

CASTILLO, J.